## American Arbitration Association
### Construction Industry Arbitration Tribunal

In the Matter of the Arbitration between:

Re:   No. 71 110 Y 00017 08
      Ulofts Lubbock, L.L.C.;
      Leoni Properties, Inc.
      vs.
      Cage Construction and Management Co., Inc.;
      Staley-Baker-Monson Partnership; Conrad Staley;
      Gary Baker; Monty Monson
      - Lubbock, Texas

## FINAL AWARD OF ARBITRATOR (REASONED)

### Introduction

This is a construction dispute between the owner and developer of an off-campus student housing project located in Lubbock, Texas and an architectural firm, the principals and owners of that firm and the company they formed to construct projects. The building at issue in this proceeding is a 40 year old dormitory purchased by the owner to convert it into student apartments and retail space.

The best intentions of all parties and their owners went awry for several compelling reasons with the result that the project was completed late, workmanship and performance issues led to entrenched positions between the owner group and the contractor/designer group, serious payment issues arose and the parties, not surprisingly, blamed one another for project failures and failed expectations. Also, not surprisingly, the parties' disputes and disagreements erupted into claims, assertions of mechanic's liens and, eventually, the resolution of their disputes and claims through this proceeding.

### The Parties

Claimants and Counter-Respondents are:

Ulofts Lubbock, L.L.C. ("Ulofts"):      Owner of the project at issue in this proceeding; and


EXHIBIT
A

| Leoni Properties, Inc. ("Leoni"): | Putative contractor for one of the "phases" of the project at issue and a student housing developer whose principal(s) and certain officers/employees were investors in Ulofts. |
|---|---|

Respondents and Counter-Claimants are:

| Cage Construction & Management Co., Inc.: | ("Cage") (Texas Corporation) Construction manager and general contractor for several "phases" of the project; |
|---|---|
| Staley-Baker-Monson Partnership: | ("SBM") (Texas general partnership) Architect for several "phases" of the project; |
| Conrad Staley: | ("Staley") General partner of SBM and shareholder of Cage; |
| Gary Baker: | ("Baker") General partner of SBM and shareholder of Cage; and |
| Monty Monson: | ("Monson") General partner of SBM and shareholder of Cage. |

## The Project

Ulofts purchased an approximately 40 year old seven-story private dormitory across the street from the Texas Tech University campus for the purpose of converting it into student apartments and renovating retail space at the ground floor level. Throughout this Award, I shall sometimes refer to building and the conversion effort as the "project".

## The Project Delivery System

Based on Ulofts' project financing requirements and Cage's bonding requirements, the parties did not utilize an integrated, unified design-build project delivery system and contracting arrangement. The same people owned SBM and Cage; Staley, Monson and Baker. Instead, Ulofts and Cage artificially divided the

project into "phases" and attempted to extend that division into various contracts. Ulofts and Cage failed to memorialize in writing their agreement as to one of the "phases", the last phase known as Phase 3. While Ulofts and Cage agree the agreement between Ulofts and Cage for this phase is an oral agreement, they vociferously disagree as to essential terms and conditions of the oral agreement.

## The Myriad and Confusing Agreements Among the Parties

The parties chose not to enter into the most logical and appropriate contract arrangement and project delivery system, a unified, integrated design-build arrangement with Cage and SBM functioning as the Design Build Contractor and Ulofts as the Owner. As previously discussed, due to financing and bonding requirements, the project, i.e. the conversion of an existing private dormitory into student apartments, was artificially divided into several "phases", all of which shared similar scopes of work, contract documents and budgets. For two of the "phases", the parties agreed in writing to a guaranteed maximum price and a lump sum price, but for the final phase, the parties failed to memorialize in writing their agreement. Ulofts and Cage stipulate to an oral "Phase 3 Contract"[1] but strongly disagree over its terms and conditions.

The written construction agreements and the oral construction agreement at issue in this proceeding lack precision and clarity, are difficult to comprehend, and directly result from Ulofts and Cage simply not giving their agreements the care, attention and review required for multi-million dollar construction transactions.

## The Agreements

The parties, Ulofts, Cage, Leoni, and SBM, entered into agreements, architectural and construction-related, one of which is oral, the terms and conditions of which are disputed by the parties, and all pertaining to converting a seven-story, 40 year old dormitory into apartment units and retail space. The agreements are:

Agreement between Ulofts, as Owner, and SBM, as Architect, made as of April 21, 2006 for architectural services for: "Conversion of existing seven story dorm into a 308 unit apartment building. Existing 9,000 sq. ft. retail space will be expanded to 15,000 sq. ft." (the "Architectural Services Agreement")[2]

---

[1]    This is the descriptive term both parties use for the oral agreement.

[2]    Claimant's Ex. 1. SBM has no construction administration duties under this agreement.

Received Time May. 8. 10:33AM

MAY-08-2009  11:29     ANDREWS MYERS COULTER-COH          7138504211     P.006

Agreement between Ulofts, as Owner, and Cage, as Construction Manager, made as of April 21, 2006 for Construction Management Services for the demolition phase. ("Construction Management Agreement")[3]

Agreement between Ulofts, as Owner, and Cage, as Contractor, made as of December 11, 2006 with a Guaranteed Maximum Price of $4,797,880 for: "Conversion of existing seven story dorm into a 308 unit apartment building. Existing 9,000 sq. ft. retail space will be expanded to 15,000 sq. ft." Substantial Completion date: April 1, 2007    ("Phase 1 Agreement")[4]

Agreement between Ulofts, as Owner, and Leoni, as Contractor, made as of December 11, 2006, with a Guaranteed Maximum Price of $5,006,692 and Substantial Completion Date: August 1, 2007 ("Ulofts/Leoni Agreement")[5]

Agreement between Leoni, as Contractor, and Cage, as Subcontractor, made as of February 5, 2007, purporting to incorporate a "Prime Contract" for the project known as "Ulofts Lubbock" with a lump sum price of $5,066,682. Substantial Completion date:  July 31, 2007 ("Phase 2 Agreement")[6]

Oral Agreement between Ulofts, as Owner, and Cage, as Contractor, the terms and conditions of which are disputed by the parties but which both parties refer to as the Phase 3 Contract. I will determine the terms and conditions of this agreement.

## The Claims of the Parties and Damages Sought

*Ulofts Claims Against Cage, SBM, Staley, Baker and Monson:*

1.    Cage: Breach of Contract for breach of the Construction Management Agreement, the Phase 1 Agreement, the Phase 2 Agreement[7], and the oral Phase 3 Agreement.

2.    SBM and its partners, Staley, Baker and Monson:  Breach of Architectural Services Agreement.

---

[3]      Claimant's Ex. 2.
[4]      Claimant's Ex. 3.
[5]      Claimant's Ex. 6. The parties signed this agreement on February 13, 2007. The scope of work of this agreement is, according to both parties, the same scope of work as that which is the basis of the Phase 2 Agreement.
[6]      Claimant's Ex. 5. Ulofts concedes it was not a party to this agreement but argues it has standing to assert a breach of contract claim against Cage as "an intended third-party beneficiary" of the agreement. See *Claimant's Post Hearing Brief*, p. 4.
[7]      Ulofts claims it is the third-party beneficiary of this agreement between Leoni and Cage. Leoni does not seek the recovery of damages from Cage under the Ulofts/Leoni Agreement.

Received Time May. 8. 10:33AM

3.    Cage, SBM, Staley, Baker and Monson:  Fraud and negligent misrepresentation.

*Damages and Relief Sought by Ulofts:*

$9,561,021.50 for:

1.   Costs allegedly "over budget";
2.   Additional travel;
3.   Additional bond fees;
4.   Additional interest on loans;
5.   Partner loan interest;
6.   Lost rental income;  and
7.   Fees for drafting condominium documents.

Plus attorneys' fees and pre-judgment interest.

*Cage's Claims Against Ulofts:*

$534,866.83 for costs incurred in performing work on the Project marked up 3% and 4%;

$20,062.50 for the letter of credit fee for the performance bond furnished by Cage;

A decree of specific performance requiring Ulofts to sign the substantial completion certificate as of August 31, 2007, and a declaratory judgment that the Phase I Shell Contract was substantially complete on that date;

$13,835.26 based on Ulofts' purported failure to pay "The Lowe's Account";

Prompt pay interest under Chapter 28 of the Texas Property Code;

Partial lost profit in the sum of $50,000;

$58,802.10 in damages for Ulofts' alleged failure to pay Cage for amounts unpaid to vendors and subcontractors of Cage;

Declaration of validity of Cage's mechanic's lien and declaration that the Ulofts/Leoni agreement was a "sham contract"[8]; and

Attorneys' fees.

## The Terms and Conditions of the Oral Agreement

The parties agree there is an oral "Phase 3 Contract". They cannot agree on the essential terms and conditions of this oral agreement. Therefore, I must determine the essential terms and conditions of the agreement they refer to as the Phase 3 Contract.

The evidence persuades me that those terms and conditions include the scope of work, guaranteed maximum price of $6,823,497 and substantial completion date of July 31, 2007 as set forth in the Standard Form of Agreement Between Owner and Contractor dated as of April 5, 2007 and unsigned by Cage but signed by Ulofts' owner's representative, Dean Minardi.[9] Cage admits the parties' Phase 3 Contract includes a guaranteed maximum price but asserts the parties never agreed to such a price.

Cage submitted applications for payment under the Phase Three Contract which it denominated "Owner Expense".[10] Those applications for payment were based on the very budget Ulofts contends was agreed to as the guaranteed maximum price.[11] In addition, Ulofts and Cage jointly prepared the budget and Cage's use of it as the basis for payment applications are significant factors in my determination that the essential terms and conditions of the Phase 3 Contract are those set forth in Claimant's Ex. 8.

I shall refer to the oral Phase 3 Contract as the "Phase 3 Oral Agreement".

## Discussion of the Parties' Claims

I reopened the hearing phase of this case because the parties' post-hearing briefing left unanswered several critical legal questions.[12] The limited purpose hearing was held on April 3, 2009.  Counsel for the parties addressed the unanswered questions so that I now have the evidence and legal authority to render this Award.

---

[8]    Pursuant to Tex. Prop. Code Sec. 53.026.

[9]    See Claimant's Ex. 8.

[10]   See e.g., Respondent's Exhibit 92, Application for Payment # 3.

[11]   Claimant's Ex. 14.

[12]   See *Order of Arbitrator Reopening Hearing for Limited Purpose of Oral Argument Based on Post-Hearing Briefing.*

Received Time May. 8. 10:33AM

The parties bear mutual responsibility for their awkward and confusing contracting arrangements and the ill-suited project delivery system described above. They hastily rushed into agreements and failed to consider the import of:

1. the appropriateness of the project delivery system(s);
2. status of design effort;
3. whether the various budgets were reasonable; and
4. the potential consequences of the requirements imposed on the parties by Ulofts' lender and Cage's surety.

With student move-in scheduled for mid-August, 2007, the substantial completion of conversion of the old dormitory into apartments by this date became the critical, driving factor in the decision making of the parties and blinded them to the risks and problems described in the preceding paragraph.

The project devolved into a debacle. Cage failed to timely perform its work and Ulofts lost patience with and confidence in Cage's project and construction management abilities. Ulofts failed to pay several of Cage's pay applications and by May, 2007, Ulofts brought in its own project manager, Tim Osborne, who essentially took over responsibility for the management and supervision of the Project. The key question in this proceeding is who is responsible for this debacle.

The owners of Cage are architects and principals and owners of SBM, an architectural firm. The evidence persuades me Cage lacked the requisite project management and construction management capabilities and expertise and project controls expertise for the project. Likewise, the evidence persuades me Cage failed to properly furnish an adequate number of field supervisors and staff for the Project, failed to adequately and properly support its small field construction supervisory staff, failed to furnish competent project management for the Project, failed to furnish competent construction management for the Project, and failed to furnish a competent, knowledgeable construction superintendent. Cage's project management and construction management for the Project was deficient and significantly below industry standards.[13]

The evidence further supports my finding that Cage's failures described in the preceding paragraph caused Cage to fail to timely, properly and efficiently perform its work under the construction agreements other than the Construction Management Agreement.[14] The remaining key question is the extent to which, if

---

[13]    The conversion project was complicated with complicated systems. Cage did not have the requisite experience and capability for a project of this complexity and magnitude.
[14]    The Construction Management Agreement was distinct from the other construction agreements at issue in this proceeding in terms of the time period of its performance by Cage and its scope of work.

any, Ulofts caused or contributed to schedule delays and slippages and the extent to which, if any, Ulofts waived Cage's breaches of contract/contracts.

There is ample evidence Cage committed numerous breaches of contract. There is also some evidence Ulofts was content to permit Cage to continue to perform deficiently and poorly from December, 2006 until May, 2007.  Ulofts continued making payments to Cage and failed to notify Cage of its failures to timely perform all of its work until May, 2007.  In May, 2007, Ulofts (and its principals) finally met with Cage and SBM and demanded a resource loaded recovery schedule for completion of the all of the work by August, 2007, the month during which students would be moving into the apartments.  Cage failed to furnish the recovery schedule and further failed to cure the numerous deficiencies in its management and performance of work under the agreements.

By the end of May, 2007, Ulofts, through Tim Osborne, assumed responsibility for the project and construction management of a project that was in a state of chaos and turmoil.  At the time of the takeover, Cage had demonstrated no reasonable prospect or ability to meet the substantial completion dates.[15]

While Cage argues Ulofts waived any breaches by them, the evidence persuades me Ulofts did not waive any such breaches.  Rather, Ulofts gave Cage ample opportunities to correct its deficient performance — opportunities Cage chose to ignore.

One of Cage's key claims is Ulofts breached the agreements by assuming responsibility for the management and completion of the Project as a result of Dean Minardi's December 28, 2006 email to Cage.[16]  Neither this email nor the evidence persuade me that Ulofts assumed responsibility for the management and completion of the project at this time or at anytime thereafter until May, 2007. Indeed, I find virtually no evidence in support of this claim other than testimony from some of Cage's principals which I do not find persuasive.

Cage further claims that the Phase 2 Agreement with Leoni is a sham contract as defined in the Texas Property Code.  I find that the Phase Two Contract is not a sham contract.

Cage further claims Ulofts breached the various agreements by failing to make timely payments.  Ulofts did fail to pay Cage but only after Cage was in material breach of contract, thereby excusing Ulofts from the obligation to pay Cage.

---

[15]     See the observations of Tim Osborne as set forth in his May 3, 2007 email, Claimant's Ex. 174. This email and Mr. Osborne's testimony are compelling evidence of the numerous deficiencies in Cage's performance, all of which constitute material breaches of contract.
[16]     Claimant's Ex. 153.

Received Time May. 8. 10:33AM

Ulofts claims SBM was in breach of contract in several respects. SBM's certification of Cage's "claims" under certain of the construction agreements was a sham[17] and is of no evidentiary value to me as the arbitrator. That said, the evidence does not persuade me that SBM breached the contract in a manner that caused Ulofts to incur legally cognizable damages.

Ulofts also seeks recovery of tort damages from Cage, SBM, Staley, Baker and Monson for fraud and negligent misrepresentation. While there is evidence Cage exaggerated and overstated its prior project experience, I do not find these statements actionable as common law fraud. The evidence does not persuade me that Cage or SBM and its partners (Staley, Baker and Monson) made material misrepresentations to Ulofts. Similarly, the evidence does not persuade me that Cage or SBM and its partners (Staley, Baker and Monson) made omissions of material facts to Ulofts. Finally, Ulofts claim for negligent misrepresentation is barred by the Economic Loss Rule.

One of the issues I asked counsel for the parties to brief is whether Texas law permits multiple construction agreements among parties in this proceeding to be viewed in a unitary manner so that segregation of damages among the agreements is not required. After hearing the argument of counsel and reviewing the relevant legal authority, I am persuaded that the Phase 1 Agreement, Ulofts/Leoni Agreement, the Phase 2 Agreement and the essential terms and conditions of the Phase 3 Oral Agreement may be read together to determine their intent. I am further persuaded that these multiple agreements should be construed as a single, unified agreement for the purpose of assessing actual damage.[18] In addition, all of these agreements, including the Phase 3 Oral Agreement, are essentially part of the same construction transaction between Ulofts and Cage, the conversion of the dormitory into student apartments and retail space, and together constitute one entire agreement between Ulofts and Cage.[19]

Given this determination, Ulofts is entitled to the recovery of completion damages in this proceeding provided it sustained its burden of proof to establish the reasonable cost to complete the unperformed work of Cage. The evidence adduced by Ulofts of the actual costs it incurred to complete Cage's work is sparse. More

---

[17]    The principals of SBM were owners of Cage, a clear conflict of interest.

[18]    See *Fort Worth Indep. School Dist. v. Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000). ("...instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to the other.....a court may determine. as a matter of law, that multiple documents comprise a written contract. In appropriate instances, court may construe all documents as if they were part of a single, unified instrument.).

[19]    *Miles v. Martin*, 159 Tex. 336, 321 S.W. 2d 62, 65 (Tex. 1959); *Veal v. Thomason*, 138 Tex. 341, 159 S.W. 2d 472, 475 (Tex. 1942).

importantly, there was no evidence of the reasonable cost of completion. Absent such evidence, Ulofts cannot recover contract damages from Cage.[20]

Ulofts also seeks recovery of consequential damages from Cage. The three written construction agreements which I have determined should be construed with the Phase 3 Oral Agreement to determine the intent of Ulofts and Cage contain mutual waivers of consequential damages.[21] The Phase 3 Oral Agreement contains essential terms and conditions based on Claimant's Ex. 8, AIA Document A111-1997 which includes AIA Document A201-1997 and the mutual waiver of consequential damages found in Section 4.3.10. I find the parties intended to mutually waive all claims for consequential damages—even under the Phase 3 Oral Agreement. Since I am construing the Phase 1 Agreement, the Ulofts/Leoni Agreement, the Phase 2 Agreement and the Phase 3 Oral Agreement as one entire agreement, I further find Ulofts and Cage mutually waived all claims for consequential damages against one another. Therefore, Ulofts' claims for consequential damages are barred.

## Cage's Mechanic's Liens

Cage is not entitled to the recovery of contract damages against Ulofts and I specifically find that Ulofts is not indebted to Cage for work performed in connection with the project. Therefore, the following mechanic's liens are invalid and should be removed by judgment of a court of competent jurisdiction from the improvements and real property[22] described in the following affidavits:

> AFFIDAVIT OF CLAIM FOR MECHANIC'S LIEN AND NOTICE OF CONSTITUTIONAL MECHANIC'S LIEN filed with the County Clerk of Lubbock County, Texas on October 15, 2007 under file no. 2007041557;[23]

> AFFIDAVIT OF CLAIM FOR MECHANIC'S LIEN AND NOTICE OF CONSTITUTIONAL MECHANIC'S LIEN filed with the County Clerk of Lubbock County, Texas on October 15, 2007 under file no. 2007041558;[24]

> AFFIDAVIT OF CLAIM FOR MECHANIC'S LIEN AND NOTICE OF CONSTITUTIONAL MECHANIC'S LIEN filed with the County Clerk of Lubbock County, Texas on October 15, 2007 under file no. 2007041559;[25]

---

[20]  *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200-201 (Tex. 2004).

[21]  See Phase 1 Agreement, Claimant's Ex. 3, Ulofts/Leoni Agreement, Claimant's Ex. 6, and Phase 2 Agreement, Claimant's Ex. 5. AIA Document A201-1997 constitutes the general conditions for all three agreements. Section 4.3.10 stipulates a mutual waiver for "damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons".

[22]  The legal description for the real property is attached as Exhibit A to this Award.

[23]  Respondent's Ex. 173.

[24]  Id.

[25]  Id.

AFFIDAVIT FOR NOTICE OF CONSTITUIONAL MECHANIC'S LIEN field with the County Clerk of Lubbock County, Texas on March 14, 2008 under file no. 2008009235;[26]

Ulofts and Cage seek recovery of significant attorney's fees amounts in this proceeding. Cage is not entitled to the recovery of attorney's fees because it is in material breach of contract as discussed earlier. Ulofts will not be recovering damages from Cage in this proceeding but I find they are entitled to recover reasonable attorney's fees from Cage because Cage is in material breach of contract, Ulofts is the prevailing party in this proceeding, and the Construction Industry Arbitration Rules authorize me to award Ulofts attorney's fees.[27] I find the sum of $400,000 as the reasonable attorney's fees sum to be awarded to Ulofts.

### Award

Cage is in material breach of contract and shall take nothing on any of its claims in this proceeding. Ulofts is not in material breach of contract and is the prevailing party in this proceeding.

For the reasons stated earlier in this Award, Ulofts shall take nothing on its claims for contract damages against Cage but is entitled to the recovery of reasonable attorney's fees from Cage. Ulofts shall recover from Cage reasonable attorney's fees in the sum of $400,000. This sum is payable no later than thirty days after the date of this award and shall bear post-judgment interest at the legal rate of 5%.

Ulofts shall take nothing on its claims for tort damages against Cage.

Ulofts shall take nothing on its claims for contract and tort damages against SBM, Staley, Baker and Monson.

The four mechanic's liens (statutory and constitutional) asserted by Cage against the improvements and real property described in Exhibit A and described above shall be removed by judgment of a court of competent jurisdiction. By way of clarification, any other mechanic's liens asserted against such improvements and real property by Cage (statutory and constitutional) similarly shall be removed by judgment of a court of competent jurisdiction.

---

26    Respondent's Ex. 182.
27    See *Construction Industry Arbitration Rules*, R-44(a) and (d).

The administrative fees and expenses of the American Arbitration Association totaling $32,800.00 and the compensation and expenses of the arbitrator totaling $51,470.31 shall be borne entirely by Cage. Therefore, Cage shall reimburse Ulofts the sum of $44,460.16, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Ulofts.

All relief not expressly granted in this Award is denied.

SIGNED: _____    DATED: May 8, 2009

William K. Andrews, Arbitrator

## American Arbitration Association

In the Matter of the Arbitration between:

Re:   No. 71 110 Y 00017 08
      Ulofts Lubbock, LLC;
      Leoni Properties, Inc.
      vs.
      Cage Construction and Management Co., Inc. and
      Staley-Baker-Monson Partnership
      - Lubbock, Texas

## EXHIBIT A

## LEGAL DESCRIPTION FOR REAL PROPERTY

264034.1  1099.103

MAY-08-2009  11:31   ANDREWS MYERS COULTER-COH   7138004211   P.016

## LEGAL DESCRIPTION

METES AND BOUNDS DESCRIPTION of Lots 5 through 20, both inclusive, and a 20 foot vacated and/or abandoned Alley lying between Lots 5 through 12 and Lots 13 through 20, Block 98, Overton Addition to the City of Lubbock, Lubbock County, Texas, according to the map, plat, and/or dedication deed thereof, recorded in Volume 18, Page 610, Deed Records of Lubbock County, Texas, being further described as follows:

BEGINNING at a "crow's foot" found in concrete in the East right-of-way line of University Avenue and the South right-of-way line of 10th Street at the Northwest corner of Lot 12, Block 98, Overton Addition, at the Northwest corner of this tract;

THENCE East, along said South right-of-way line of 10th Street and the North line of Lots 5-12, Block 98 a distance of 400.00 feet to a 3/8" iron rod found at the Northeast corner of Lot 5, Block 98, and the Northeast corner of this tract;

THENCE South, along the East line of Lots 5 and 20, Block 98, a distance of 300.00 feet to a 1/2" iron rod found in the North right-of-way line of Main Street at the Southeast corner of said Lot 20, Block 98, at the Southeast corner of this tract;

THENCE West, along said North right-of-way line of Main Street and the South line of Lots 13-20, Block 98, a distance of 400.00 feet to a cross found in concrete in the East right-of-way of University Avenue, at the Southwest corner of this tract;

THENCE North, along the East right-of-way line of said University Avenue and the West line of Lots 12 and 13, Block 98, a distance of 300.00 feet to the Point of Beginning

CONTAINS 120,000 sq. ft. or 2.75 acres

## FILED AND RECORDED

OFFICIAL PUBLIC RECORDS

Kelly Pinion

Kelly Pinion, County Clerk
Lubbock County  TEXAS
October 15, 2007  01:27:22 PM
FEE: $24.00         2007041559

